**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: July 27 2015

John P. Gustafson
United States Bankruptcy Judge

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 14-34564 |
| | ) | |
| Teah Michele Floyd, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | JUDGE JOHN P. GUSTAFSON |

### MEMORANDUM OF DECISION RE MOTION TO DISMISS

This case comes before the court on the United States Trustee's ("the UST") motion to dismiss Debtor Teah Michele Floyd's ("Debtor") Chapter 7 case ("Motion") for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 24] and Debtor's response ("Response") [Doc. # 35]. Debtor's Response was filed by attorney Randy Reeves ("Debtor's Counsel"). An Objection to the Motion [Doc. # 36] was also filed by Debtor's original counsel, Howard A. Elliott, who subsequently moved for, and was granted, leave to withdraw from this Chapter 7 case. [Doc. ## 38, 39].

The court held an evidentiary hearing on the Motion that Debtor, Debtor's Counsel, Counsel for the UST, and bankruptcy auditor for the UST Katherine Lowman attended in person and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this

court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O); *In re Rooney*, 436 B.R. 454, 455 (Bankr. N.D. Ohio 2010).

Having considered the motion, the response and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtor's Chapter 7 case unless she converts the case to Chapter 13.

## **BACKGROUND**

Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on December 26, 2014, stating that her debts are primarily consumer debts. [UST Ex. 2]. Debtor's Schedule D shows total secured debt in the amount of $133,382.00. Debtor's secured debts include $112,382.00 secured by a mortgage on her home, which she valued at $140,000.00, and $21,000.00 secured by a lien on the title of a 2012 Honda Accord, which she valued at $19,000.00. [*Id.*]. Debtor stated an intention to reaffirm the debts on both the home and the motor vehicle, and a reaffirmation agreement on the motor vehicle has been entered into and filed with the court in this case. [Doc. # 21]. A reaffirmation agreement has not been filed with the court regarding the home, although Debtor testified at trial that she wishes the modify the loan with the intention of moving back into the home or renting it out.

Debtor's bankruptcy schedules do not show any unsecured priority debt. [UST Ex. 2]. Debtor's Schedule F shows unsecured nonpriority debts in the amount of $108,484.11, which consists of student loan debt in the amount of $59,911.00, medical services in the amount of $1,474.00, and credit card debt in the amount of $41,832.00. [*Id.*].

Debtor is a Senior Financial Analyst for Smith's Medical, where she testified that she has been employed since September of 2014. Prior to her employment at Smith's Medical, Debtor worked at Cooper Tire and Rubber Co. ("Cooper Tire") from 2010 to 2013. Debtor testified that she was laid off by Cooper Tire in December 2013. Debtor's Statement of Financial Affairs shows that Debtor had a 2013 income of $77,024.78 [UST Ex. 2, p. 26], and Debtor's federal tax return certifies that Debtor received an adjusted gross income of $47,684.00 in 2014. [UST Ex. 6, p. 1].

During her period of unemployment, from late December 2013 to September, 2014, Debtor testified that there was a delay in receiving unemployment benefits, and that she spent monies from her Cooper Tire retirement account for living expenses. At the time of filing, Debtor had a second retirement account, from a previous job, with a listed value of $50,000.

Debtor's original Schedule I, [UST Ex. 2, Schedule I], shows monthly income, less payroll

2

14-34564-jpg    Doc 53    FILED 07/27/15    ENTERED 07/27/15 16:10:01    Page 2 of 9

deductions for taxes and Social Security, insurance, and medical savings totaling $3,946.43. The original Schedule I did not reflect monies received for child support as income, although the income was reflected on Statement of Financial Affairs question 2, which listed child support of just over $4,600 a year as having been received in 2012, 2013 and year-to-date 2014.

Debtor's Amended Schedule I [UST Ex. 3, Schedule I] shows monthly income, less payroll deductions for taxes and Social Security, a voluntary contribution for a retirement plan, insurance, and medical savings, in addition to $438 in other income regularly received for child support, totaling $3,568.20. Debtor claims "zero deductions/exemptions" on her W-4 for tax withholding purposes.

According to Debtor's original and Amended Schedule J and Debtor's testimony at the hearing, Debtor is single and has a 14 year old dependant who lives with her. [UST Ex. 2, Schedule J; UST Ex. 3, Schedule J]. Debtor's original Schedule J shows total monthly expenses of $3,770.50. Those expenses included a mortgage payment of $1,100.00, home maintenance in the amount of $50, $680 in utilities (including $280 for telephone, cell phone, internet, satellite, and cable services), transportation in the amount of $400, charitable contributions in the amount of $108, and $150 in recreation. [UST Ex. 2, Schedule J]. The monthly contribution to "medical savings" is listed as $403. [UST Ex. 2, Schedule I, Line 5h]. Debtor's original Schedules I and J show a net monthly income of $175.93.

Debtor's Amended Schedule J reflects total monthly expenses of $4,149.23, reflecting the cost of living in a Columbus apartment and the cost of travel back and forth between Columbus and the home she still owns in Lima. Those expenses include monthly rent of $1,226.00, $666 in utilities (including $285 for telephone, cell phone, internet, satellite, and cable services), $100 for personal care products and services, transportation in the amount of $310, $75 for charitable contributions, $250 for clothing, laundry, and dry cleaning, and $0 for recreation[1]. The monthly contribution to "medical savings" is listed as $873.17. [UST Ex. 3, Schedule I, Line 5h]. Debtor's Amended Schedules I and J show a net monthly income of -$581.03.

Debtor's 2013 federal tax return showed that she had taxable wages of $71,320 and received an income tax refund of $6,538. [UST. Ex. 5]. In 2015, based upon Debtor's pay stub, her gross salary will be $80,001. [UST Ex. 4]. Debtor's 2013 salary was above the average median income of a family of 2 in Ohio, and her 2015 income exceeds the average median of a family of 2 by $26,450. [Doc. # 24, p. 7; http://www.justice.gov/ust/eo/bapcpa/20141101/bci_data/median_income_table.htm].

---

[1]/ It appears that extracurricular school activity fees were moved from the "entertainment" line to the "children's education costs" line.

Debtor testified that she has to borrow money from her mother to make ends meet. The financial information in her bankruptcy case, with certain corrections, did not reflect that borrowing would be necessary. The numbers for the medical savings account, in both the original and the Amended Schedule I, substantially overstate the amount the Debtor is actually contributing on a monthly basis. Instead of $403 or $873.17 (dollar amounts which reflected large short-term "catch up payments") the Debtor's pay advices indicate that the Debtor contributes about $80 a month to a health savings account. Further, it appears that the Debtor did not, at the time of filing, make a voluntary contribution to a retirement account. That contribution was commenced after the filing, and is in an amount that appears to be greater than the average contribution Debtor was making when she was employed by her previous employer, Cooper Tire.

Finally, Debtor testified about expenses associated with her former residence in Lima, Ohio. Later in the Hearing, it was disclosed that the reason those expenses are still being incurred is that the Debtor is attempting to keep both her home in Lima, Ohio, as well as her new apartment in Columbus, Ohio. Debtor hopes to be able to move back to Lima at some point, and has been negotiating for a loan modification on the Lima, Ohio mortgage, although she has not made any payments on that mortgage since a few months before the Chapter 7 case was filed.

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test

14-34564-jpg    Doc 53    FILED 07/27/15    ENTERED 07/27/15 16:10:01    Page 4 of 9

from "substantial abuse" to "abuse." *McGowan v. McDermott*, 445 B.R. 821, 824 n.5 (N.D. Ohio 2011); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). As the movant, the UST carries the overall burden of demonstrating, by a preponderance of the evidence, that Debtors' case should be dismissed. *In re Weixel,* 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013).

In this case, the UST does not argue that Debtor filed her petition in bad faith[2]. Instead, the UST asserts that the totality of Debtor's financial circumstance demonstrates that she is not needy and that granting her a discharge would be an abuse of the provisions of Chapter 7. The "totality of the circumstances test" allows the court to consider both prepetition and postpetition circumstances. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006)("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Ng*, 477 B.R. 118, 130-131 (9th Cir. 2012); *In re Mestemaker,* 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007).

A debtor is "needy" when "[her] financial predicament warrants the discharge of [her] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126; *In re Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at *8 (Bankr. N.D. Ohio March 9, 2015). Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126.

Both Debtor's original and Amended schedules show that she is eligible to be a debtor under Chapter 13. Her secured and unsecured debts are less than the Chapter 13 debt limits. *See*, 11 U.S.C. § 109(e). She also has regular income that appears to be stable. Although Debtor was unemployed for the first eight (8) months of 2014, she succeeded in obtaining employment with Smith's Medical, where she worked for

---

[2]/ Clearly, there was a "triggering event" that was outside of Debtor's control: her loss of employment with Cooper Tire and the longer than expected search for comparable employment. However, as discussed, Debtor had obtained comparable employment several months before filing her Chapter 7.

5

roughly four (4) months before the filing of her petition, and where she continues to work as of the date of the court's evidentiary hearing on the UST's Motion. *See,* 11 U.S.C. § 101(30). As previously noted in this opinion, Debtor has income well above the median for her family size, so the applicable commitment period for any Chapter 13 plan she proposed would be five years. 11U.S.C. § 1325(b)(4)(A)(ii).

Under § 707(b)(3), the UST argues that Debtor has sufficient disposable income to repay a portion of her unsecured debts out of future earnings, in a Chapter 13 plan or otherwise. The UST argues that a voluntary deferred compensation retirement plan contribution of $266.67 listed on Debtor's Amended Schedule I is not a proper expense deduction and should be treated as income available to fund a Chapter 13 plan. The UST also demonstrated that Debtor's listing of $873.17 as a "Medical Savings" deduction is incorrect, as Debtor's pay stubs and testimony indicate a much smaller monthly amount. Further, the UST challenges the charitable contributions on Debtor's Schedule J. Specifically, the UST takes issue with the monthly amount spent on charitable contributions. While Debtor listed her charitable contributions at $150/month in her original Schedules, that number has been reduced to $75/month in her Amended Schedules. The UST asserts that Debtor's tax returns do not provide evidence that Debtor is donating to charity in the amount she lists on Schedule J, and Debtor has not substantiated that such contributions have actually been made.

Finally, the UST argued that Debtor will likely have federal tax refunds, based upon her 2013 federal refund and "over withholding" for taxes. This is additional funding that can be used to pay creditors. In summary, the UST argued that some "belt-tightening" with regards to Debtor's Schedule J expenses, the removal of the improperly-deducted voluntary deferred compensation retirement plan amount from Schedule I, a correctly-listed amount for a "Medical Savings" deduction, in addition to the expected federal tax return income, would free-up additional disposable income that could be used to fund a Chapter 13 plan to repay Debtor's unsecured creditors. The court agrees.

The original Schedules I and J showed a monthly net income of $175.93. [Doc. # 1, Schedules I, J]. In Amended Schedules I and J, filed with the court on May 15, 2015 and included in UST's Exhibits as Exhibit 3, Debtor listed net monthly income of -$581.03. This net income number reflects: 1) a voluntary retirement plan contribution commenced post-filing in an amount that appears to be larger than was contributed prior to the Debtor's job loss; 2) a "Medical Savings" deduction that is overstated by approximately $790 a month; and 3) an increase in her insurance deduction from $179.38 to $540. There were other smaller adjustments to Schedule J expenses

With respect to Debtor's voluntary retirement contribution listed on her Amended Schedule I, the court agrees with the UST that the $266.67 deduction should be applied to a ratable distribution among all of Debtor's unsecured creditors. Legally, the voluntary retirement contribution is an impermissible deduction when determining an ability to pay under § 707(b)'s needs-based analysis. In *In re Glenn*, the court explained:

> When looking to a debtor's 'need' in a § 707(b) action, the Sixth Circuit Court of Appeals has set forth the precedent that, 'a debtor's voluntary remuneration to a retirement account, whether by contribution or the repayment of a loan, cannot be excluded from a debtor's disposable income.' The reasoning for this is straightforward: it would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend.

*In re Glenn*, 345 B.R. at 835, *citing Harshbarger v. Pees* (*In re Harshbarger*), 66 F.3d 775 (6th Cir.1995); *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434–35 (6th Cir.2004); *In re Hodge*, 2014 WL 1419852 at *4-5, (Bankr. N.D. Ohio April 11, 2014). Moreover, Debtor was not making a voluntary retirement contribution at the time the Chapter 7 case was filed.[3] The contribution was only commenced after the bankruptcy case was filed. *Cf.*, *In re Seafort*, 669 F.3d 662 (6th Cir. 2012)(Chapter 13 debtor could not increase retirement contribution when 401(k) loan was paid off). When the voluntary retirement contribution is removed from Debtor's Amended Schedule I, Debtor's net income is -$314.33

At the evidentiary hearing held on this matter, a bankruptcy auditor for the UST, Katherine Lowman ("Ms. Lowman"), testified that the amount listed on Debtor's Amended Schedule I for a "Medical Savings" deduction is incorrect. Ms. Lowman testified that the $873.17 listed on Debtor's schedule was overstated "by about $790." Debtor's testimony and a review of Debtor's pay stubs [UST Ex. 4] confirms that Debtor has a deduction from each bi-weekly paycheck of $36.37 for a health care FSA. When this deduction is corrected on Debtor's Amended Schedule I, reducing the deduction from $873.17 to an estimated $80.00, Debtor's "monthly net income" is $478.84.

Debtor received an income tax refund of $6,538.00 for the 2013 tax year, when her "total income" for the same tax year was $72,075.00. [UST Ex. 5]. Debtor's 2014 federal tax refund was significantly smaller, at $2,192, as Debtor did not obtain employment until September 2014. However, based upon a

---

[3]/ The original Schedules, filed on December 26, 2014 do not reflect any deduction for "Voluntary contributions to retirement plans". [UST Ex. 2, Schedule I, Line 5c]. The voluntary retirement contribution deduction of $266.67 first appears on the Amended Schedules filed May 15, 2015. [UST Ex. 3, Schedule I, Line 5c].

review of Debtor's pay stubs [UST Ex. 4], it appears that Debtor will have income comparable to 2013, or greater, for the 2015 tax year. Debtor testified that she would be unable to take a deduction for her daughter[4] in 2015, and Ms. Lowman testified that, in her view, Debtor would also be unable to take a head of household deduction. Even so, although Debtor testified to facts that would lead to a greatly reduced federal tax refund in 2015, her tax withholding reflects ""0 Exemptions/Allowances" [UST Ex. 4], and Debtor will be able to claim herself on her taxes. Moreover, Debtor testified that she is able to claim her daughter as a dependant every other year. During the course of a Chapter 13 Plan she will receive substantial refunds in any year in which she can claim her daughter as a dependant. Such funds would be additional funds that could be used to pay creditors, increasing the funds that would be available to an amount in excess of the aforementioned "monthly net income" of $478.84.

Although not available on a monthly basis, because income tax refunds arise as the result of the taxpayer's overpayment of their tax liability or over-withholding from wages, tax refunds are a source of income for a debtor and are included in a determination of Debtor's ability to pay unsecured creditors. *In re Jacob*, 447 B.R. 535, 543 (Bankr. N.D. Ohio 2010); *In re Edighoffer*, 375 B.R. 789, 797 (Bankr. N.D. Ohio 2007); *In re Fox*, No. 13-12566-RAG, 2014 WL 6066120, at *7, 2014 Bankr. LEXIS 4695, at *20 (Bankr. D. Md. Nov. 12, 2014)(citing cases).

Finally, the UST claims, and the court agrees to a certain extent, that Debtor has the ability to create additional monthly net income by means of belt-tightening. The court believes that Debtor's expenses could be reduced without depriving her or her dependent of adequate food, clothing, shelter or other necessities such that a meaningful payment to creditors can be made. Overall, the Debtor's budget cannot be characterized as "lean" for a family of two, and does not reflect a serious attempt to minimize expenses going forward. More specifically, the court finds Debtor's attempt to retain both her home in Lima, and her apartment in Columbus, to be a source of unnecessary expenses.

Debtor testified that before she obtained employment in Columbus, she owned and maintained a home in Lima. Although she remains employed with Smith's Medical, and lives in a Columbus apartment complex where the rent is more than her previous home mortgage, Debtor has held onto the idea of seeking to move back to Lima at some point in the future, and is looking for a job in the area. Although creditor Superior Federal Credit Union has moved for and been granted relief from stay on the home, Debtor is still

---

[4]/Debtor testified that she has shared custody of her daughter, and her ex-husband will take the child's tax deduction for 2015.

attempting to modify the mortgage in order to keep the property to either live in or to rent out[5]. Debtor stated that she is not currently paying utilities for the Lima property, but she testified that she is paying $40/week to have the lawn mowed, and has travel expenses returning to Lima. The expenses associated with keeping the Debtor's options open on an additional residence should be paid to Debtor's unsecured creditors. "[W]hile bankruptcy relief is not conditioned upon a debtor living in poverty, it does envision a sacrifice on the part of the debtor." *In re Felske*, 385 B.R. 649, 656 (Bankr. N.D. Ohio 2008). Courts have held that the cost of maintaining two homes is, in most cases, not a "necessary expense". *See*, *In re Gutierrez,* 528 B.R. 1, 19-20 (Bankr. D. Vt. 2014)("Ordinarily, a debtor maintaining two residences would be hard pressed to argue that both residences are necessary, and that having them is not a lavish extravagance."); *In re Turner*, 2010 WL 2509966 at *3-4, 2010 Bankr. LEXIS 1964 at *10-12 (Bankr. D. Mass. June 17, 2010).

Accordingly, the court finds that, based on the facts presented at the hearing, granting Debtor relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the totality of her financial circumstances. *See In re Behlke,* 338 F.3d at 437 (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors). Debtor is not needy in the sense of the necessity of relief under Chapter 7 to improve her financial situation at this time, and the evidence shows that Debtor has the ability to pay a significant portion of her unsecured debt such that granting her a Chapter 7 discharge would be an abuse of those provisions.

Pursuant to *In re Krohn*, the UST has shown not only that Debtor has the present ability to repay her creditors with a meaningful distribution through a Chapter 13 plan, but also that Debtor enjoys a stable source of future income and can further reduce her expenses through belt tightening without deprivation of reasonable expenses for food, shelter, clothing, and other necessities. *In re Krohn*, 886 F.2d at 126-27.

**THEREFORE**, based on all of the foregoing reasons and authorities, good cause appearing,

**IT IS ORDERED** that Debtor is allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the United States Trustee's motion to dismiss [Doc. # 24] will be granted, and this case will be dismissed, by separate order of the court.

###

---

[5]/ Debtor's plans, if any, to "rent out" the house in Lima were vague, and appeared at best secondary to her goal of keeping the house in the event she could find a suitable job in the Lima area.